Mary Ellen **BURKE** and Kevin Burke, infants, by their mother and natural guardian, Lorraine A. **BURKE**, Lorraine A. Burke, individually and Kevin Burke, individually, Plaintiffs,

v.

The **DOW CHEMICAL CO.**, Kenco Chemical & Mfg. Corp., and Core Markets, Inc., Defendants.

No. CV 90–3344.

United States District Court, E.D. New York.

July 16, 1992.

Stephen Seidner, Fisher & Seidner, Babylon, N.Y., for plaintiffs.

Frederick T. Smith, McCarter & English, New York City, for Dow Chemical.

Karen B. Rabinowitz, Nixon, Hargrave, Devans & Doyle, Garden City, N.Y., for Kenco Chemical and Core Markets.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge:

The claim is that two children are brain damaged because their mother was exposed to a household insecticide while pregnant with them. Relying on state tort law, the parents sue both the manufacturer of the active ingredient and of the final product. Defendants move for summary judgment on the ground that the suit is preempted by the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) and corresponding regulations. *See* 7 U.S.C. §§ 136–136y; 40 C.F.R. §§ 152–86 (1990).

FIFRA requires all insecticides to be registered with the federal Environmental Protection Agency (EPA). EPA is required to review information supplied by registrants concerning the efficacy and environmental effects of each insecticide. EPA must also approve all insecticide labels and packaging. Under FIFRA, EPA's authority over labeling is exclusive: states are barred from imposing further labeling requirements.

The issue in the case is whether these and other FIFRA provisions preclude common law actions against insecticide manufacturers and retailers. The question is particularly important and timely since the United States Supreme Court has just spoken on the issue of tort preemption in *Cipollone v. Liggett Group, Inc.,* — U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). For the reasons indicated below, none of the state law tort actions are preempted in their entirety. The motions for summary judgment therefore must be denied.

## I. FACTS

Defendant Dow Chemical Company produces chlorpyrifos, sold under the trade name Dursban. Dursban has been registered under FIFRA as a pesticide since 1981 and is packaged in containers bearing an EPA-approved label. Dursban is not an "end-use" product: Dow sells it exclusively to insecticide manufacturers.

Defendant Kenco Manufacturing, a subsidiary of defendant Core Markets, Inc., uses Dursban and a solvent, Xylene, in manufacturing "Rid–A–Bug Flea & Tick Killer." Rid–A–Bug is sold both to professional exterminators and directly to consumers in home dispensers to combat flea and tick infestation. The product is registered with EPA and sold with an EPA-approved label that includes directions for indoor and outdoor use, a money-back guarantee, and the following warnings:

## CAUTION

### Precautionary Statements

Human (& Domestic Animal) Hazards

May be fatal if swallowed, inhaled or absorbed through skin. Do not breathe spray mix. Do not get into eyes, on skin or clothing. In case of contact with skin or eyes, flush with water and get medical attention for eyes. Wash with soap and water after handling and before eating or smoking. Avoid contamination of feed and foodstuffs. Do not apply or allow to drift to areas occupied by unprotected humans or beneficial animals. Do not allow children in treated areas until surfaces are dry. Do not use in edible product areas of food processing plants, restaurants, and other areas where food is commercially prepared or processed. Do not use in serving areas while food is exposed.

### Environmental Hazards

This product is toxic to fish. Do not contaminate water by cleaning of equipment or disposal of wastes.

### Physical or Chemical Hazards

Disposal: Do not reuse empty container. Wrap container and put in trash collection.

Plaintiff Lorraine Burke alleges that on several occasions in 1986 and 1987 while she was pregnant, both she and a professional exterminator sprayed "Rid–A–Bug" in her home on Long Island. She claims that the sprayings, by exposing her to both Dursban and Xylene, caused her children to be born with severe brain damage and other injuries.

## II. LAW

For purposes of defendants' motions for summary judgment, it is assumed that, on the facts alleged, plaintiffs have legally cognizable state causes of action. The question is whether Congress has exercised its authority under the Supremacy Clause of the federal Constitution to bar plaintiffs' access to otherwise available state common law remedies.

In approaching the issue, we must bear in mind that protection of the public against toxic substances has traditionally

been a matter left to the states. The states have developed a complex, interlocking set of statutory and common law substantive, procedural and remedial tort rules. These rules have evolved to provide compensation for injuries and to help deter injurious behavior in a complex industrial environment where technology has outrun the ability of the average person to understand the dangers which he or she confronts and how to protect against them.

By contrast, the federal government has never adopted comprehensive legislation for compensating those injured by hazardous products. It is a relative newcomer to this area and its tentative forays into the field have mainly been designed to ensure that products can pass freely from one state to another without the need for repackaging, although it has excluded from all commerce certain dangerous products, as in the field of drugs and toys. In most instances, federal legislation does not arrange for tests of products to determine whether they are dangerous to pregnant women or anyone else. Nor do the agencies of the federal government put their seal of approval on products such as flea and tick sprays. Consumers and others must still look to the great font of state tort law for protection against harmful toxic substances. Too ready a tendency to declare the state protective shield replaced by the still somewhat spotty federal protections will leave many injured persons without recourse. *Cf., e.g., Morales v. Trans World Airlines, Inc.,* — U.S. ——, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (in light of comprehensive national airline regulation and broad statutory preemption clause, state regulation of airline advertising invalidated).

### A. New York Products Liability Law

Under the Supremacy and Commerce Clauses of the federal Constitution, Congress has the power to determine the reach of FIFRA and whether state tort law has any application in areas which FIFRA touches. To the extent that state tort law does operate, New York's law of conflicts determines which state's law applies. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313

U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Here New York residents are suing for alleged torts whose locus was also New York. Under these circumstances it makes no difference where the product was manufactured or where the manufacturers were domiciled. New York tort law will apply. *See Ashley v. Abbott Lab.,* 789 F.Supp. 552, 566–67 (E.D.N.Y.1992) (discussing New York choice-of-law rules in tort cases); Harold Korn, *The Choice-of-Law Revolution: A Critique,* 83 Colum.L.Rev. 772 (1983); *cf. Wilson v. Chevron Chem. Co.,* 1986 WL 14925, at ★ 3 (S.D.N.Y. Dec. 17, 1986) (FIFRA preemption case; in conflict between punitive damage rules, New York choice of law rules favor application of law of state where tort occurred).

Plaintiffs seek recovery under design defect, failure to warn and negligence theories. Their implied warranty claim is, under New York law, subsumed in the design defect claim. *See Jones v. Lederle Lab.,* 695 F.Supp. 700, 709 (E.D.N.Y.1988).

### 1. Design Defect

■■■ New York uses a risk-utility balancing approach in deciding whether a product is defectively designed. The test is whether,

at the time of … manufacture, a reasonable person with knowledge of the defect would conclude that the risks inherent in the product's design outweighed the utility in marketing it.

*Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 108, 463 N.Y.S.2d 398, 402, 450 N.E.2d 204, 208 (1983). Plaintiffs contend that both Dursban and Rid–A–Bug presented human health risks that outweighed their value as insecticides. A jury would have to determine whether

a reasonable person with knowledge of the potential for injury of the product and of the available alternatives, balancing the product's risks against its utility and costs and against the risks, utilities and cost of the alternatives, would have concluded that it should not have been marketed.

*Cover v. Cohen,* 61 N.Y.2d 261, 266–67, 473 N.Y.S.2d 378, 380, 461 N.E.2d 864, 866 (1984).

A product may be so dangerous that it should not be sold at all, even if the warnings on the labels are as effective as they can be. Liability may also result if the product requires the special skill of a professional in its application so that it should not have been packaged and sold for consumer use. Nothing offered by the parties suggests that these and other risk-benefit balancing questions are anything but open in this litigation.

### 2. *Failure to Warn*

Plaintiffs further allege that Rid–A–Bug "lacked proper warning notices" of the dangers posed by the product to fetuses and that Dursban and Rid–A–Bug were "not properly tested and/or studied to determine the effects ... on women during pregnancy and their unborn fetuses" and therefore "did not provide proper warnings."

Manufacturers and retailers of products have a duty under New York law to provide warnings adequate to alert consumers to non-obvious dangers attendant on their use. *See Frederick v. Niagara Mach. & Tool Works,* 107 A.D.2d 1063, 486 N.Y.S.2d 564 (App.Div. 4th Dept.1985); *Maher v. Atlas Transit Mix Corp.,* 104 A.D.2d 591, 479 N.Y.S.2d 376 (App.Div.2d Dept.1984). Failure to warn claims can be understood either as negligence actions or as forming a separate branch of strict products liability law under which an otherwise sound product is deemed defective because it lacks warnings. *Frederick,* 486 N.Y.S.2d at 565; *see also* James A. Henderson, Jr. & Aaron D. Twerski, *Doctrinal Collapse in Products Liability: The Empty Shell of Failure to Warn,* 65 N.Y.U.L.Rev. 265, 271–78 (1990) (failure to warn claims more readily adjudicated as negligence than strict liability claims).

Both negligence and strict liability standards require that a manufacturer or seller of a product who knows or should know of non-obvious dangers inherent in the foreseeable uses of its product ade-

quately warn users of those dangers. *See Voss v. Black & Decker Mfg. Co.,* 59 N.Y.S.2d 102, 107, 463 N.Y.S.2d 398, 401, 450 N.E.2d 204, 207 (1983). A variety of factors determine the adequacy of a warning:

> The nature of the warning and to whom it should be given depends upon a number of factors including the harm that may result from use of the product without the warnings, the reliability and adverse interest of the person to whom the notice is given, the kind of product involved and the burden in disseminating the warning.

*Frederick,* 486 N.Y.S.2d at 565 (citation omitted); *see also* David W. Leebron, *An Introduction to Products Liability: Origins, Issues and Trends,* 1990 Ann. Surv.Am.L. 395, 416 (issue in failure to warn cases is whether "the reasonable user is likely to read [the warnings] and [whether] [the warnings] sufficiently alert[ ] the user to the nature and degree of the danger, as well as how the danger can best be avoided.").

Although not the manufacturer of the "end use" product, Dow still may have had a duty to warn consumers of dangers posed by Dursban, particularly if it knew how its industrial customers would use and merchandise their products. It may also be liable under New York law for injuries caused by Rid–A–Bug if plaintiffs can prove that Xylene or the mixture of Dursban and Xylene is teratogenic, that Dow knew or should have known this and that Dow failed to transmit this knowledge to its own industrial customers or to the ultimate users. *See In re Agent Orange Prod. Liab. Litig.,* 597 F.Supp. 740, 830–32 (E.D.N.Y.1984) (manufacturer of herbicide who was or should have been aware of dangers posed by product of another manufacturer whose product was to be combined with its own has duty to warn purchaser), *aff'd,* 818 F.2d 145 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988). Insofar as Dow sells Dursban only to licensed applicators, a version of the learned intermediary doctrine may apply. *See Stilties v. Ridco Extermi-*

*nating Co.*, 178 Ga.App. 438, 343 S.E.2d 715, *aff'd*, 256 Ga. 255, 347 S.E.2d 568 (1986). These issues will likely be capable of resolution only after further discovery and a trial.

### 3. *Negligence*

Plaintiffs' remaining causes of action assert that the defendants were negligent in designing and manufacturing Dursban and Rid–A–Bug. So far as can now be determined, these claims are essentially embraced by the design defect and failure to warn theories already discussed.

## B. FIFRA

In view of the preemption issue raised by defendants it is important to note at the outset that, in FIFRA itself, Congress explicitly acknowledges the continuing power of the states to participate in the control and regulation of toxic substances covered by the statute. The relevant provisions read:

§ 136v. Authority of States

(a) In general

A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by [EPA].

(b) Uniformity

Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required [by EPA].

The application of these provisions to the instant case requires that they be interpreted in light of the history of FIFRA and their place in the statutory scheme.

### 1. *History*

Since its initial passage in 1947, FIFRA has undergone several significant transformations, each reflecting dissatisfaction with existing mechanisms for limiting the potential health risks posed by chemical pesticides.

As originally enacted, FIFRA was overseen by the Department of Agriculture. In 1970, responsibility for pesticide regulation was transferred to EPA. *See* Tybe A. Brett & Jane E.R. Potter, *Risks to Human Health Associated with Exposure to Pesticides at the Time of Application and the Role of the Courts*, 1 Vill. Envt'l L.J. 355, 358 (1990). The statute was completely overhauled in 1972 when, in light of concerns over the health risks of DDT and other chemical pesticides, Congress "transformed FIFRA … into a comprehensive regulatory statute." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 992, 104 S.Ct. 2862, 2867, 81 L.Ed.2d 815 (1984).

Under the 1972 amendments, EPA was required to reconsider within two years the applications of all previously approved pesticides, applying new standards set out in the amendments. Subsequent amendments in 1978 and 1988 set new timetables for re-registration. These changes also established more substantial data requirements for registration, passed-on the cost of registration to applicants through registration fees and provided EPA with more authority to obtain data necessary for the agency to make its registration decisions. During the reassessment periods called for under the various amendments, most previously registered pesticides have remained on the market. Brett & Potter, *Exposure to Pesticides, supra,* at 362.

Despite these efforts to rationalize and strengthen the statute, EPA still relies on manufacturers for information about the safety of their products. It does not conduct independent testing. Much of the information known to the manufacturer is withheld from the public. As two students of the field have noted,

the basic structure of FIFRA remains unchanged. The production of data to support a pesticide registration is controlled by the registrant, and this data may be withheld from public scrutiny as a trade secret.

*Id.* at 363. FIFRA makes some token efforts to ensure that interested parties are aware of registration proceedings. EPA is required to publish in the Federal Register any application for registration of a new pesticide or for a new use of an existing pesticide. 7 U.S.C. § 136a(c)(4). It is un-

reasonable to expect that lay-consumers will keep abreast of developments in the Federal Register. Section 136h(d)(1) also provides for the release of health and safety data, although "the public continues to experience difficulty gaining access to [this] data...." Brett & Potter, *Exposure to Pesticides, supra,* at 363.

### 2. *Registration*

Unless alerted by the manufacturer to dangers or the need for special restrictions in the use of the product, it is unlikely that EPA will assume the burden of deciding whether a product should not be sold to the public or used in the home. While no insecticide may be sold in the United States unless registered with EPA, 7 U.S.C. §§ 136(t) & (u), 136a(a), it is the applicants for registration who are responsible for submitting performance data and draft product labels to EPA. The data that must be submitted depends on the nature of the pesticide and its intended use. *See* 40 C.F.R. § 158.100–158.740. EPA does not attempt to independently verify the test data provided, but does determine if the testing methodology reportedly used is "acceptable" in light of generally accepted scientific standards. *Id.* § 158.80; Brett & Potter, *Exposure to Pesticides, supra,* at 359.

On the basis of the information provided by the registrant, EPA must register the product if it determines that:

(A) its composition is such as to warrant the proposed claims for it;

(B) its labeling and other material require[d] to be submitted comply with the requirements of this subchapter;

(C) it will perform its intended function without unreasonable adverse effects on the environment; and

(D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.

7 U.S.C. § 136a(c)(5). "Unreasonable adverse effects on the environment" are defined as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide."

*Id.* § 136(bb). Registrations must be renewed every five years, although renewal does not require submission of new data. *Id.* § 136d(a)(1). A pesticide may be registered subject to use limitations, e.g., requiring that it be applied by certified applicators. Whether such limitations should apply depends largely on the information supplied by the manufacturer.

■ If substantial questions arise as to the safety of the registered pesticide, EPA may initiate proceedings to impose use restrictions on, or cancel the registration of, a pesticide. *Id.* § 136d(b). During such proceedings the original registration cannot be revoked unless necessary, in the view of the EPA Administrator, to prevent an imminent hazard. *See Love v. Thomas,* 858 F.2d 1347 (9th Cir.1988) (reversing EPA suspension), *cert. denied,* 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 403 (1989).

■ It is possible for individuals with standing to petition EPA to cancel or suspend registrations. *See Environmental Defense Fund v. Hardin,* 428 F.2d 1093 (D.C.Cir.1970) (granting EDF standing to challenge EPA decision not to cancel DDT registrations); *see also National Coalition Against Misuse of Pesticides v. Environmental Protection Agency,* 867 F.2d 636, 639 (D.C.Cir.1989) (noting petition). Judicial review of EPA decisions not to cancel or suspend a registration is available under 7 U.S.C. § 136n(a). Since consumers will not ordinarily bring such petitions, absent a catastrophe, intervention by environmental groups or voluntary action by the manufacturer, EPA oversight will not be nearly as protective of persons exposed to pesticides as state tort law.

### 3. *Labeling*

FIFRA states that EPA must determine if a pesticide's "labeling and other material require[d] to be submitted comply with the requirements of this subchapter." 7 U.S.C. § 136a(c)(5)(B). "Label" and "labeling" are broadly defined in the statute as follows:

(1) Label.—The term "label" means the written, printed or graphic matter on, or

attached to, the pesticide ... or any of its containers or wrappers.

(2) Labeling.—The term "labeling" means all labels and other written, printed, or graphic matter—(A) accompanying the pesticide ... at any time; or (B) to which reference is made on the label or in literature accompanying the pesticide....

*Id.* § 136(p).

Regulations issued by EPA control in considerable detail the form and content of pesticide labels. *See* 40 C.F.R. § 156.10. Required warnings are specified according to the degree to which ingestion or contact with a pesticide is toxic. *Id.* § 156.10(h). These warnings must include precautionary statements about risks posed to humans and domestic animals. *Id.* § 156.-10(h)(2)(1)(A). Regulations specifying necessary directions on how to use each pesticide are provided in 40 C.F.R. § 156.10(i). Use of child-resistant packaging is also specified. *Id.* § 156.

Additional FIFRA provisions allow EPA to seize pesticides that are mislabelled or otherwise "misbranded." 7 U.S.C. §§ 136(q), 136j, 136k. Misbranding may be a basis for civil and criminal penalties. *Id.* § 136*l*.

The parties have submitted no information on whether advertisements constitute "labeling" under FIFRA. Exhibit D of Defendant Kenco's Notice of Motion for Summary Judgment does include a TV commercial script for Rid–A–Bug which appears to have been stamped "APPROVED" by EPA. Whether this implies that advertisements are covered as labeling is unclear. As the case develops, it may be that the advertising issue will require further analysis, suggesting motions for *in limine* rulings or partial summary judgment. Such rulings would be premature at this stage of the litigation.

The court also need not decide now whether a manufacturer can be held liable under federal common law or state tort law for failing to bring to EPA's attention the need to modify a product label to give, for example, greater warnings to pregnant women or to lay-users when the product is

sold for use in the home. These issues are not raised in the pleadings.

## C. Preemption Doctrine

### 1. *Preemption provisions in FIFRA*

As already noted in Part II B, *supra,* FIFRA contains a general "savings clause" that leaves the states free to impose sale and use restrictions on pesticides and an express preemption provision with respect to state labeling requirements. 7 U.S.C. § 136v(a), (b). Regulation of the use or sale of pesticides may be accomplished directly by state statute or regulation or, as is customary, indirectly through state tort law. FIFRA ensures, however, that no pesticide may be used without EPA approval, and that the states may not *directly* impose labeling requirements.

### 2. *Preemption Generally*

■ Otherwise valid state law is preempted if (1) Congress expressly preempts the state law, (2) Congress has completely occupied the law's field of operation, (3) compliance with both federal and state law is impossible, or (4) the state law presents an obstacle to the achievement of the full purposes and objectives of Congress. *Wisconsin Public Intervenor v. Mortier,* —— U.S. ——, 111 S.Ct. 2476, 2481–82, 115 L.Ed.2d 532 (1991).

■ Absent express preemption, courts are not to infer preemption lightly, particularly in areas traditionally of core concern to the states such as tort law. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 144, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); *see also Mortier,* 111 S.Ct. at 2482. In *Mortier,* for example, the Court faced the question of whether local governments were afforded room to regulate the use of pesticides under FIFRA's savings clause, which refers only to "State[s]". The Court showed great reluctance to read express preemption of local regulation from Congressional silence. *Mortier,* 111 S.Ct. at 2483. It likewise refused to infer "occupation of the

field" preemption. *Id.* at 2486. Finally, it found no conflict between the allowance of local regulation and FIFRA's goal of a coordinated "regulatory partnership" between federal and state authorities. *Id.* at 2487. Other recent Supreme Court tort preemption cases reveal a similar reluctance to infer preemption. *See International Paper Co. v. Ouellette,* 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987) (while Clean Water Act preempts nuisance action under law of state that is affected by pollution from out-of-state source, act does not preempt suit under nuisance law of source state); *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (state punitive damages provisions not preempted by Atomic Energy Act).

As the Supreme Court's most recent tort preemption case indicates, where Congress has provided an express preemption clause, the presumption against preemption requires courts to read the clause narrowly. *See Cipollone v. Liggett Group, Inc.,* —— U.S. ——, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

*Cipollone* concerned the preemptive effect on state common law failure to warn, warranty and misrepresentation actions of federal cigarette labeling laws passed in 1965 and 1969. The 1965 law contained express preemption language as follows:

> No statement relating to smoking and health other than the [federally mandated warning] shall be required on any cigarette package ... [or] in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.

*Id.* at ——, 112 S.Ct. at 2616. The 1969 law contained a provision stating that:

> No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.

*Id.*

At the outset of its analysis, the Court carefully circumscribed its preemption inquiry, noting that "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Id.* at ——, 112 S.Ct. at 2618. Construing the 1965 provision "in light of the presumption against the pre-emption of state police power regulations," *id.,* the court found no evidence of a congressional plan to preempt or of a "general, inherent conflict between federal pre-emption of state warning requirements and the continued vitality of state common law damages actions." *Id.* On the Court's understanding, the main purpose of the 1965 Act was to avoid consumer confusion by ensuring uniform labeling, a purpose whose achievement would not be fettered by state tort law actions. *Id.*

The Court reached a somewhat different result in analyzing the 1969 cigarette act. The language of that statute prevents states from imposing any "requirement or prohibition" on the advertising or promotion of cigarettes, as opposed to the 1965 law, which barred states from requiring any "statement relating to smoking." This and other statutory changes indicated to the Court that Congress intended to broaden the preemptive reach of the federal cigarette law. Since common law tort claims, could, depending on their substance, amount to a "requirement or obligation ... imposed under State law with respect to ... advertising or promotion," the court set itself the task of "fairly but— in light of the strong presumption against pre-emption—narrowly constru[ing] the precise language of [the 1969 Act's pre-emption clause] and ... look[ing] to each of petitioner's common law claims to determine whether it is in fact pre-empted." *Id.* at ——, 112 S.Ct. at 2621 (footnote omitted).

Turning to the petitioners' failure to warn claims, the Court concluded that:

> insofar as claims under ... failure to warn theory require a showing that respondents' post–1969 advertising or promotions should have included additional, or more clearly stated, warnings, those claims are pre-empted. The Act does not, however, pre-empt petitioner's

claims that rely solely on respondents' testing or research practices or other actions unrelated to advertising or promotion.

*Id.* at ——, 112 S.Ct. at 2621. Similarly, the Court found the 1969 law to have preemptive effect on petitioners' misrepresentation claims only to the extent that those claims alleged misrepresentations made in cigarette advertisements. To the extent that the cigarette manufacturer was under a "state law duty to disclose such facts through channels of communication other than advertising or promotion," no preemption was found. *Id.* at ——–——, 112 S.Ct. at 2623. Finally, the Court held that, since express warranties are imposed by the warrantor rather than the state, petitioners' warranty claims were not preempted.

### III. APPLICATION OF LAW TO FACTS

#### A. Failure to Warn Claims

Plaintiffs' failure to warn claims maintain that defendants failed to determine if their products were harmful to fetuses and that the products lacked proper warning notices. Defendants contend that these claims are expressly preempted under section 136v(b) because, if pressed successfully, they would constitute state-imposed "requirements for labeling or packaging in addition to or different from those required [under FIFRA]." Alternatively, they claim that FIFRA impliedly preempts such claims.

#### 1. *Case Law*

A number of federal district and appellate courts have ruled on this issue with varying results.

*Ferebee v. Chevron Chem. Co.,* 736 F.2d 1529 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), remains a leading case. The Court of Appeals for the District of Columbia Circuit found no preemption when affirming a jury verdict holding a manufacturer of the herbicide paraquat liable under Maryland law for failure to warn of possible long term health effects from exposure to its product.

Express preemption was absent because nothing in FIFRA expressly bars state common law tort actions. *Id.* at 1542. A common law right of recovery, the court reasoned, is not a "requirement" within the meaning of FIFRA's preemption clause because it is "not equivalent to a direct regulatory command." *Id.* at 1541.

The Court of Appeals also rejected the contention that there was an implied preemption. The federal and state laws did not actually conflict since Maryland law did not require defendant to change its labeling for products sold in Maryland, but only to pay for injuries caused by its failure to warn. After the verdict, defendant could still comply with federal labeling laws: it was left with the choices of not selling its product in Maryland, submitting a new label for EPA approval, or continuing to sell with the existing label at the cost of paying damages. *Id.* at 1543. Finally, the court held that the jury verdict did not stand in the way of achieving the full purposes of Congress. The purposes of the statute, the court reasoned, include protection of citizens from chemical hazards, a function furthered by the jury verdict. *Id.* at 1542.

*Ferebee* envisioned FIFRA and state tort law serving complementary functions. EPA's determination that a label is "adequate" for purposes of FIFRA was deemed not to settle the issue of adequacy for purposes of state tort law on the ground that state laws complement FIFRA in two respects. First, to the extent that both FIFRA and state tort law are intended to ensure the availability of pesticides that provide economic benefits that outweigh their costs, EPA's calculation serves to create a *"floor* of safe conduct" but not "a *ceiling* on the ability of states to protect their citizens." *Id.* at 1543 (emphasis in original). Second, state tort law serves the additional function of compensating injured persons not covered by FIFRA. With respect to this function, Maryland was free to decide that

> as between a manufacturer and an injured party, the manufacturer ought to bear the cost of compensating for those injuries that could have been prevented

with a more detailed label than that [originally] approved by the EPA.

*Id.* at 1541.

A number of district court decisions, including the only decision on this subject in the Second Circuit, have followed *Ferebee* in its general approach. *See Thornton v. Fondren Green Apartments,* 788 F.Supp. 928 (S.D.Tx.1992); *Montana Pole & Treating Plant v. I.F. Laucks & Co.,* 775 F.Supp. 1339 (D.Mont.1991); *Evenson v. Osmose Wood Preserving, Inc.,* 760 F.Supp. 1345 (S.D.Ind.1990); *Stewart v. Ortho Consumer Prods.,* 1990 WL 36129 (E.D.La. Mar. 26, 1990); *Cox v. Velsicol Chem. Corp.,* 704 F.Supp. 85 (E.D.Pa.1989); *Wilson v. Chevron Chem. Co.,* 1986 WL 14925 (S.D.N.Y. Dec. 17, 1986).

Two Courts of Appeal and several district courts have rejected *Ferebee's* analysis and found that FIFRA preempts failure to warn claims. *See Arkansas–Platte & Gulf Partnership v. Van Waters & Rogers, Inc.,* 959 F.2d 158 (10th Cir.1992); *Papas v. Upjohn Co.,* 926 F.2d 1019 (11th Cir.1991), *vacated and remanded for further consideration in light of Cipollone v. Liggett Group, Inc.,* — U.S. ——, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992); *Hurt v. Dow Chem. Co.,* 759 F.Supp. 556 (E.D.Mo. 1990); *Kennan v. Dow Chem. Co.,* 717 F.Supp. 799 (M.D.Fla.1989); *Fisher v. Chevron Chem. Co.,* 716 F.Supp. 1283 (W.D.Mo.1989); *Watson v. Orkin Exterminating Co.,* 1988 WL 235673 (D.Md.1988); *Fitzgerald v. Mallinckrodt, Inc.,* 681 F.Supp. 404 (E.D.Mich.1987); *see also Worm v. American Cyanamid Co.,* 970 F.2d 1301 (4th Cir.1992) (remanding for determination of extent to which plaintiffs' common law claims impose a duty to provide warnings beyond those required by EPA).

Although these decisions generally agree with *Ferebee* that FIFRA does not *expressly* preempt failure to warn claims, *see, e.g., Papas,* 926 F.2d at 1024; *Arkansas–Platte,* 959 F.2d at 164, they find implied preemption on the grounds that (1) compliance with both state and federal law is not possible, *Papas,* 926 F.2d at 1025; (2) state tort recoveries would stand as an obstacle to

ensuring national uniformity in labels, *id.;* and (3) Congress has occupied the sub-field of pesticide labeling. *Arkansas–Platte,* 959 F.2d at 163–64.

The decisions finding implied preemption maintain that *Ferebee's* conclusion that the imposition of failure to warn liability leaves pesticide manufacturers "free" either to not sell the product in the state or to pay for liabilities resulting from sales is artificial. In practice, the most likely effect of state law failure to warn liability will be to encourage manufacturers and retailers to seek approval from EPA to change their labels. *See Arkansas–Platte,* 959 F.2d at 162 ("A business choice between paying damages and changing the label is only notional."). This course of action, the anti-*Ferebee* cases suggest, would undermine FIFRA in two ways. First, it would amount to the states second-guessing EPA's determination of what constitutes adequate labeling. *See id.; Papas,* 926 F.2d at 1025. Second, tort liability in individual cases could cause a product-by-product relabeling, thereby defeating FIFRA's goal of achieving "uniformity of labeling across the nation and among ... different brands of the same pesticide." *Papas,* 926 F.2d at 1019.

### 2. *Analysis*

#### a. Express preemption.

As indicated above, express preemption analysis did not figure in the decisions of the three courts of appeal that have faced the present issue. *But see Arkansas–Platte,* 959 F.2d at 163 (finding that Congress has occupied subfield of labeling essentially on grounds of express preemption provision). *Cipollone,* however, would appear to have undermined this consensus. *See Papas v. Zoecon Co.,* — U.S. ——, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992) (remanding decision finding implied preemption under FIFRA for reconsideration in light of *Cipollone* ). Where there is an express preemption provision, the Supreme Court stated that "there is no need to infer Congressional intent," *Cipollone v. Liggett Group, Inc.,* — U.S. ——, ——, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992)

(quoting *California Fed. Sav. & Loan Assn. v. Guerra*, 479 U.S. 272, 282, 107 S.Ct. 683, 690, 93 L.Ed.2d 613 (1987)), at least when the "provision provides a 'reliable indicium of congressional intent with respect to state authority.'" *Id.* at ——, 112 S.Ct. at 2618 (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 505, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978)).

■ In light of *Cipollone*, then, courts must focus on the specific wording of preemption clauses, interpreting them narrowly in light of the presumption against preemption. The precise question before the court is whether plaintiffs' failure to warn claims, if successful, would amount to a state-imposed "requirement[ ] for labeling or packaging in addition to or different from those required [under FIFRA]."

As compared to the two provisions analyzed in *Cipollone*, the preemption provision of FIFRA lies somewhere in between the 1965 and 1969 cigarette laws. Section 136v(b) prohibits a state from imposing any "requirement" "for labeling or packaging" "different from" EPA requirements. The fact that the provision speaks only to labeling and packaging causes it to resemble the 1965 cigarette act's provision that "no statement relating to smoking or health" "shall be required on any cigarette package." In fact, the 1965 act encroaches further on state powers than FIFRA because it also prohibits the states from mandating added warnings in "advertising" about "smoking and health." Unlike the 1965 act, however, FIFRA bars states from imposing "requirements" (rather than from requiring statements), a usage which the *Cipollone* Court took to have a broader preemptive effect when it construed the 1969 act containing a ban on any state "requirement" with respect to "advertising or promotion" of cigarettes.

According to *Cipollone*, for purposes of the 1965 cigarette labeling laws, a *Ferebee*-like distinction must be drawn between state regulatory law and state tort law, with only the former being preempted. Thus, a direct application of that part of the *Cipollone* case would entail no preemption of plaintiffs' failure to warn causes of action in the instant case. The Court said flatly: "we conclude that … the 1965 act only pre-empted state and federal rulemaking bodies from mandating particular cautionary statements and did not pre-empt state law damages actions." *Id.* at ——, 112 S.Ct. at 2618.

FIFRA's use of the word "requirement," however, cautions against going so far as to adopt the *Ferebee* distinction between regulatory and common law in its entirety. The word "requirement" in the 1969 cigarette act led the *Cipollone* court to conclude that such a hard and fast distinction had not been drawn by Congress in the later act. Accordingly, it found plaintiff's state tort law failure to warn claims partially preempted to the extent that they involved claims that cigarette advertisements had provided inadequate warnings.

As already pointed out, however, FIFRA's preemption clause shares some of the characteristics of the narrower 1965 act's preemption clause. In addition, unlike the more restrictive 1969 cigarette law, FIFRA provides a general savings clause explicitly authorizing each state to "regulate the sale or use" of federally registered pesticides within its borders. 7 U.S.C. § 136v(a). While courts must ordinarily construe preemption clauses narrowly, they must be especially cautious when Congress itself has identified an extremely broad area of authorized state conduct. Both the language of FIFRA's preemption clause and the statute's savings clause indicate a congressional design to leave the states with expansive powers to "regulate" pesticides.

■ Applying the somewhat subtle distinctions of *Cipollone*, if EPA-approved labels were in fact affixed to the relevant containers, plaintiffs may not claim that defendants' products were mislabeled. If, however, warnings to the trade, warnings apart from labels or packaging, limitation on sales to professionals, or other protections falling generally within the ambit of warnings should have been used when the content of the label was fixed by EPA there remains a liability question for the trier of fact. *Cf. New York Pesticide Co-*

*alition, Inc. v. Jorling,* 874 F.2d 115 (2d Cir.1989) (state regulation requiring notice of pesticide ingredients and dangers to potentially affected persons by signs, advertisements and other means falls within FIFRA savings clause and is not preempted). The possible question of whether EPA was misled by defendants also remains.

### b. Implied Preemption

■ Even ignoring the directive in *Cipollone* to focus exclusively on express preemption clauses, plaintiffs' failure to warn claims ought to stand against a charge of implied preemption.

Both sides of the debate in the implied preemption cases have a point. The anti-*Ferebee* cases are persuasive in reasoning that a "business choice between paying damages and changing the label is notional." *Arkansas–Platte,* 959 F.2d at 162. Yet, applying a finding of implied preemption would permit a manufacturer that was or should have been aware of dangers to refrain from informing EPA of needed changes in its product's label and then to hide behind the very label it knew to be inadequate.

It may be that the answer to the conundrum is to find an actionable continuing obligation to inform EPA of product dangers. What is apparent is that on the present state of the law, it cannot be said with any assurance that either or both defendants must prevail. The federalism issues are too important to warrant foreclosing recovery to an injured party on a questionable theory of implied preemption. *See, e.g.,* Paul Wolfson, *Preemption and Federalism: The Missing Link,* 16 Hastings Const. L.Q. 69 (1988); Marc Z. Edell & Cynthia A. Walters, *The Doctrine of Implied Preemption in Products Liability Cases—Federalism in the Balance,* 54 Tenn.L.Rev. 603 (1987).

None of plaintiffs' claims are implicitly preempted. Under the preceding express preemption analysis, however, defendants are entitled to some preemption protection, the precise extent of which need not be determined before completion of discovery.

### B. Negligence and Design Defect Claims

■ *Cipollone* did not consider the preemptive effect of the cigarette laws on design defect and negligence claims, although it may be assumed from the Court's holdings that the claims would have survived. Even the federal circuit courts that have found failure to warn claims preempted by FIFRA have not held that design defect and negligence claims are also preempted. *See Arkansas–Platte,* 959 F.2d at 164; *Papas,* 926 F.2d at 1026. Several district courts finding preemption of failure to warn claims have specifically held that other tort claims are not preempted. *See, e.g., Hurt v. Dow Chem. Co.,* 759 F.Supp. 556, 560 (E.D.Mo.1990); *Kennan v. Dow Chem. Co.,* 717 F.Supp. 799, 812 (M.D.Fla.1989).

At least one reported New York state case has, however, found that FIFRA completely preempts state law tort actions. *See Little v. Dow Chem. Co.,* 148 Misc.2d 11, 559 N.Y.S.2d 788 (N.Y.Sup.Ct.1990); *see also Warner v. American Fluoride Corp.,* No. 10142/83 (N.Y.Sup.Ct. June 19, 1992). The *Little* court, while finding *Ferebee* "compelling," felt obliged to reject *Ferebee's* interpretation of FIFRA in light of the Supreme Court's interpretation of the federal Clean Water Act in the *Ouellette* case. *Little,* 559 N.Y.S.2d at 791. In reaching this conclusion, the state court seems to have been of the view that *Ouellette* found the Clean Water Act to have preempted all common law nuisance suits concerning water pollution. *Id.* *Ouellette* was not nearly so broad, holding only that nuisance suits must be brought under the law of the state from which the pollution emanates. Thus understood, it is hard to see how *Ouellette* even indirectly undermines *Ferebee* and all other federal FIFRA cases that have found design defect and negligence actions not preempted. Even were we to consider *Little* a precedent that must be followed in this diversity case under *Erie* doctrine—a doubtful proposition since characterization of preemption is a federal issue—*Little* was decided without the benefit of *Cipollone*. It is not conceiv-

able that any New York state court would now find FIFRA to have completely preempted all state tort law.

■ As a general rule, compliance with federal standards does not, in and of itself, immunize a manufacturer or retailer from state law tort liability. *See Ferebee,* 736 F.2d at 1542. FIFRA's savings clause serves to emphasize this point. That EPA must determine whether a pesticide "will perform its intended function without unreasonable adverse effects on the environment" under 7 U.S.C. § 136a(c)(5)(C), does not supplant the state's power to render a judgment as to the relative risks and benefits of the product. Arguably, the EPA determination may be evidence to be considered along with all other relevant evidence in determining whether defendants' behavior was tortious. As with the other issues in this case not yet ripe for resolution, this decision should be left for post-discovery rulings.

## IV. CONCLUSION

Defendants' motions for summary judgment on the grounds of preemption are denied.

So ordered.