OPINION OF THE COURT
Mary M. Werner, J.
This action, brought by the Commissioner of the New York *190 State Department of Environmental Conservation and the Commissioner of the Suffolk County Department of Health Services (plaintiffs) in September 1989, seeks injunctive relief, damages and penalties with respect to groundwater contamination in Suffolk County by the herbicide dimethyl tetrachloroterephthalate and/or its metabolites. Plaintiffs seek summary judgment declaring that defendants are liable for the creation of a public nuisance and a permanent injunction. Alternatively, plaintiffs request that the court issue a preliminary injunction. Defendant also seeks summary judgment as well as leave to amend its answer.
BACKGROUND
Dimethyl tetrachloroterephthalate, which is more commonly known as dachtal or DCPA, is an herbicide that kills weeds and crabgrass. It is a synthetic organic chemical that was patented in 1960. Diamond Shamrock Corporation first registered pesticide products containing DCPA in 1958 with the Environmental Protection Agency (EPA) pursuant to the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) (7 USC § 136).
In 1971 Diamond Shamrock registered DCPA with New York State, which pursuant to ECL 33-0701 and 33-1301 (1) (a) requires that every pesticide used or sold in New York be registered with the Department of Environmental Conservation (DEC) every two years.
On December 20, 1983 defendant SDS Biotech Corporation informed the New York State Department of Environmental Conservation that it had replaced Diamond Shamrock Corporation as the registrant for pesticides containing DCPA. SDS Biotech subsequently changed its name to Fermenta Plant Protection Company, Fermenta ASC Corporation and, most recently, ISK Biotech Corporation. These entities will be referred to collectively as Fermenta.
DCPA performs its function in proximity to germinating seed on or right below the surface. DCPA has low solubility and apparently adheres to soil particles. However, once applied to the soil, DCPA first breaks down to monomethyl tetrachloroterephthalic acid (MTCPA) and subsequently to tetrachloroterephthalic acid (TCPA). It is undisputed that TCPA does not occur naturally in the environment and that it is the metabolite of DCPA. What is disputed, however, is whether DCPA is the sole parent of TCPA.
*191 Unlike DCPA, TCPA is highly soluble. According to Dr. Gary Eilrich, Fermenta’s vice-president of technology, TCPA is 10,000 times more soluble than DCPA which means that TCPA is very mobile in soils and is easily transported through soil by rain.
The New York State Department of Health, which regulates drinking water systems (Public Health Law §§ 201, 225) has promulgated regulations which are found at 10 NYCRR part 5, subpart 5-1. These regulations were amended in 1988 to establish general organic chemical standards for drinking water, and set a maximum contaminant level (MCL) of 0.05 milligrams per liter or 50 parts per billion (ppb) for unspecified organic contaminants (UOC). This standard applies to TCPA, which is a UOC as defined by the regulations. Prior to 1988 50 ppb for UOC’s was merely a guideline and not a standard.
In addition to the Health Department regulations, DEC also has promulgated regulations with respect to drinking water. DEC has classified the three aquifers on Long Island as class GA which is best used as a potable water supply (6 NYCRR 701.15). To protect this resource from degradation, DEC promulgated numerical standards for contaminants in class GA waters (6 NYCRR 703.5). The standard for TCPA in class GA waters is again 50 ppb.
According to William Spitz, an environmental geologist with DEC, the subsurface of Long Island is composed of mostly unconsolidated materials — gravel, sand, silt and clay. Given the porous nature of the subsurface, soluble pollutants are easily transported through the subsoils to the aquifer. Once the aquifer becomes contaminated it remains contaminated and the contamination spreads.
Dennis Moran, the Chief Engineer of the Division of Environmental Quality in the Suffolk County Department of Health Services (DHS), states in his affidavit that he first learned in 1981 that Diamond Shamrock had undertaken, in conjunction with the Long Island Horticultural Research Laboratory, a groundwater sampling effort in Suffolk County with respect to DCPA or its metabolite, TCPA. Moran, upon requesting the results, was put in contact with Jerry Lucietta, a manager at Diamond Shamrock, who informed Moran that seven farm wells had been tested in 1979.
In 1980 Diamond Shamrock monitored on a monthly basis six private wells in Riverhead, Orient and East Marion for *192 DCPA or TCPA. According to the report, which Moran received in 1982, of the seven farm wells three had detectable amounts of TCPA ranging from 1.05 to 569.5 ppb. The other well had a level of 96.3 ppb. Of the six private wells being monitored monthly, all six had detectable levels of TCPA ranging from .5 ppb to 891 ppb. Five of the six wells had levels greater than 50 ppb.
Since the testing was first conducted in 1979, several additional samplings were completed. Results of the 1982 sampling showed that 24 of the 155 wells had detectable levels of TCPA. Seven wells had TCPA levels in excess of 50 ppb, with the highest level being 1039 ppb in Sepenoski Farm Labor Camp in East Marion. The data also showed that two public water supply wells, the Reeves Beach Water supply well No. 3 and the Browns Hills water supply well, had TCPA levels in excess of 50 ppb.
In March 1985, Fermenta agreed to analyze additional samples. From April to May of 1985, 66 samples from 32 locations were collected by DHS and sent to Fermenta. The results of this sampling showed that 12 of the 32 wells had detectable levels of TCPA, 4 of which exceeded 50 ppb. Whenever levels of TCPA in excess of DEC standards were discovered DHS notified the owners of the private wells and advised them to cease using their wells for drinking water. DHS also notified the public water suppliers and instructed them to not use the contaminated wells.
In 1987 more samples were collected from 15 private wells in eastern Suffolk County. These samples were analyzed for DCPA and its metabolites by Hazelton Laboratories in Madison, Wisconsin. DHS bore the cost of these analyses. The results of these tests showed that all 15 wells had detectable levels of TCPA, 5 of which exceeded 50 ppb. A copy of the results was forwarded to Fermenta in April 1987.
After an unsuccessful meeting between State, County and Fermenta officials regarding remedial efforts, the State and County commenced this lawsuit in 1989. At the time 43 private wells were known to be contaminated, 15 of which had TCPA levels in excess of 50 ppb. In addition two public water supplies had levels above the standard.
1991 sampling results showed that 131 out of 1,679 wells had detectable limits. Fifty of those wells had levels exceeding 50 ppb.
Plaintiffs in now moving for summary judgment seek a *193 declaratory judgment and a mandatory injunction. More specifically, plaintiffs seek an order:
(1) declaring that the presence of the chemical TCPA in the groundwater and drinking water, in excess of standards promulgated by the State of New York constitutes a public nuisance for which the defendants are liable;
(2) directing defendants to undertake, subject to State and County oversight and approval, such studies as are necessary to determine the nature and extent of the TCPA contamination in Suffolk County, evaluate the feasibility of various remedial technologies that would achieve a permanent or long-term solution to the contamination and implement and maintain the remedial technology selected by the State and County;
(3) directing defendants, pending the implementation of such permanent or long-term solution, to provide well-head treatment and/or alternative water supplies to those entities impacted by TCPA contamination;
(4) requiring defendants to recall products containing dachtal or DCPA from commerce in Suffolk County; and
(5) entering judgment for all damages suffered by the plaintiffs and for all costs incurred by the plaintiffs.
In the alternative, plaintiffs seek a preliminary order pursuant to CPLR 6301 et seq.:
(1) directing defendants, pending the final resolution of this action, to take such measures as necessary, subject to the approval of the State and County, including well-head treatment and the provision of alternative water supplies, to ensure that all persons and entities affected by TCPA contamination are provided with potable water; and
(2) directing defendants to recall products containing dachtal or DCPA from commerce in Suffolk County.
Defendants cross-move for summary judgment in favor of defendants on the issue of liability and for an order pursuant to CPLR 3025 granting defendants leave to amend their answer to include the following affirmative defenses: (1) plaintiffs assumed the risk; (2) plaintiffs failed to mitigate damages; and (3) preemption of plaintiffs’ claim by Federal law.
DISCUSSION
Initially the court must address that part of Fermenta’s cross motion which seeks to amend its answer. The decision to *194 grant or deny leave to amend pleadings is within the court’s discretion (Edenwald Contr. Co. v City of New York, 60 NY2d 957 [1983]; Napoli v Canada Dry Bottling Co., 166 AD2d 696 [2d Dept 1990]). It is well settled that leave to amend will be freely granted in the absence of prejudice or surprise to the defendants arising from the amendments (Quiros v Polow, 135 AD2d 697 [2d Dept 1987]).
Moreover, while a "court is not required to permit futile amendments which may lead to needless litigation” (Saferstein v Mideast Sys., 143 AD2d 82, 83 [2d Dept 1988]), "the legal sufficiency or merits of the proposed amendments will not be examined unless the insufficiency or lack of merit is clear” (Board of Mgrs. v Bayberry Green Assocs., 174 AD2d 595 [2d Dept 1991]).
Since the legal insufficiency of defendant’s proposed amendments is not clear, and since there is no discernible prejudice to plaintiffs, the court grants that part of Fermenta’s motion to amend its answer. The motion and cross motion for summary judgment will thus be considered in light of the amended answer.

Nuisance

Plaintiffs claim that defendant is liable for the creation of a public nuisance. Before determining whether plaintiffs have demonstrated that this is so as a matter of law, some background in the law of nuisance in the State of New York is instructive.
Any discussion of the law of nuisance must necessarily distinguish between a private nuisance and a public nuisance. "A public, or as sometimes termed a common, nuisance is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency * * * It consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all * * * in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons” (Copart Indus. v Consolidated Edison Co., 41 NY2d 564, 568 [1977]; see also, New York State Natl. Org. for Women v Terry, 886 F2d 1339 [2d Cir 1989], cert denied 495 US 947).
In contrast, one is subject to liability for a private nuisance where his or her conduct invades the private use of property. *195 In order to succeed in an action to abate a private nuisance, plaintiff must show that defendant’s invasion is "(1) intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the rules governing liability for abnormally dangerous conditions or activities” (Copart Indus. v Consolidated Edison Co., supra, at 569). However, a plaintiff in an action to abate a public nuisance is not required to demonstrate negligence or willful conduct on behalf of the defendant (see, State of New York v Schenectady Chems., 117 Misc 2d 960 [Sup Ct, Rensselaer County 1983], mod 103 AD2d 33 [3d Dept 1984]; State of New York v Shore Realty Corp., 759 F2d 1032 [2d Cir 1985]).
"New York public nuisance law is clear that, in an action brought by the State in the exercise of its police powers for either abatement or restitution 'fault is not an issue, the inquiry being limited to whether the condition created, not the conduct creating it, is causing damage to the public’ ” (United States v Hooker Chems. & Plastics Corp., 722 F Supp 960, 968 [WD NY 1989], quoting State of New York v Schenectady Chems., 117 Misc 2d, supra, at 970).
While generally nuisance actions are brought against landowners (see, State of New York v Shore Realty Corp., supra), " 'everyone who creates a nuisance or participates in the creation or maintenance * * * of a nuisance are liable jointly and severally for the wrong and injury done thereby’ * * * Even a nonlandowner can be liable for taking part in the creation of a nuisance upon the property of another.” (State of New York v Schenectady Chems., 117 Misc 2d, supra, at 966 [citations omitted]; see also, Suffolk County Water Auth. v Union Carbide Corp., NYLJ, May 2, 1991, at 28, col 1.)
Moreover, this court agrees with Justice Robert Doyle who, in Suffolk County Water Auth. v Union Carbide Corp. (supra), wrote that control over the product, in that case temik, a pesticide commonly used by potato farmers, is not a prerequisite for liability for any resulting injury or damage.
The question before the court, of course, is whether Fermenta is liable for the creation of a public nuisance as a matter of law. It is clear that the release or threat of release of hazardous wastes into the environment is a public nuisance (see, State of New York v Shore Realty Corp., supra; State of New York v Schenectady Chems., 103 AD2d, supra, at 35). However, there are no allegations that Fermenta has been releasing hazardous wastes into the environment. There is no *196 evidence that DCPA or TCPA is on any Federal or State list of hazardous materials.
It is undisputed, however, that there are presently levels of TCPA in various private arid public wells in excess of DEC standards. These drinking water standards have never been challenged or overturned. Such standards and regulations are presumptively valid and will not be overturned absent a demonstration that they are arbitrary (Ostrer v Schenck, 41 NY2d 782, 786 [1987]).
Notably, Fermenta has commenced no proceeding to challenge the validity of DEC’S regulations and standards. Rather, in opposition to this motion and in defense of this action, Fermenta argues that the mere contravention of a regulatory standard without more is insufficient to show actual or threatened harm from the nuisance and disagrees that 50 ppb’s is an appropriate standard for TCPA. Based on its own studies, Fermenta claims that people can tolerate exposure to TCPA at levels far in excess of State standards. In support of its position, Fermenta cites to the results of its various animal studies which it claims indicate that TCPA produces no toxicological effects at levels as high as 10,000 ppb and is essentially nontoxic.
On the other hand, plaintiffs have cited no authority for the proposition that the contravention of a regulatory standard alone is sufficient to establish that the manufacturer and distributor are liable as a matter of law for the creation of a public nuisance. Moreover, the affidavits submitted by plaintiffs do not establish the existence of a public nuisance as a matter of law.
The court finds the foregoing to present a factual question as to whether Fermenta is liable for the creation of a public nuisance. More specifically, there are factual questions as to whether the presence of TCPA in the groundwater at levels in excess of DEC standards or at any level detected endangers or injures the property, health, safety or comfort of a considerable number of persons.

Nuisance Per Se

The court rejects the plaintiffs’ theory that because there are levels of TCPA in excess of DEC standards, defendant is liable for a per se nuisance.
ECL 17-0501 states: "It shall be unlawful for any person, directly or indirectly, to throw, drain, run or otherwise dis *197 charge into such waters organic or inorganic matter that shall cause or contribute to a condition in contravention of the standards adopted by the department pursuant to section 17-0301”.
While it is undisputed that TCP A is present in the groundwater at levels in excess of DEC standards, the Court in Schenectady Chems. (supra, 103 AD2d, at 35-36) has already rejected the argument that migration of chemicals through the soil constitutes a discharge under ECL 17-0501: "The general term 'discharge’ should be read to embrace activities similar to the specific terms before it * * * Those terms, 'throw’, 'drain’ and 'run’, connote some active human conduct, as opposed to a mere seepage over the course of time. Additionally, the statute speaks to a 'discharge into such waters’, which indicates a direct introduction of pollutants into the waters, rather than a migration of pollutants from the soil * * * [T]he phrase 'directly or indirectly’ modifies the word 'person’, thereby extending coverage of the statute to one acting through intermediaries. We do not read the phrase as referring to an indirect contamination of State waters, i.e., by migration through the soil. By its terms, then, ECL 17-0501 does not embrace a gradual migration of pollutants”.

Abnormally Dangerous Activity

As an alternative theory of liability, plaintiffs claim that Fermenta is strictly liable for the creation of a public nuisance through an abnormally dangerous activity or the use of an unreasonably dangerous product.
"Determining whether an activity is abnormally dangerous involves multiple factors. Analysis of no one factor is determinative. Moreover, even an activity abnormally dangerous under one set of circumstances is not necessarily abnormally dangerous for all occasions * * *
"Guidelines, however, are identifiable. The many cases and authorities suggest the numerous factors to be weighed. Particularly useful are the six criteria listed in Restatement of Torts Second (§ 520): '(a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value *198 to the community is outweighed by its dangerous attributes’.” (Doundoulakis v Town of Hempstead, 42 NY2d 440, 448 [1977].)
The court has already determined that factual questions exist as whether the presence of TCPA at levels detected in Suffolk County’s groundwater constitutes a threat to public health. Accordingly, there is no showing that as a matter of law there is a high degree of risk and a likelihood that any resulting harm will be great. Moreover, any future risk has been reduced by Fermenta voluntarily directing users not to apply DCPA products on soil in Suffolk County. Weighing of risks versus benefits cannot be determined now as a matter of law, since the risks to the community have not been fully established. While perhaps DCPA products have been inappropriately applied in Suffolk County, this one factor alone is insufficient to establish that as a matter of law Fermenta has engaged in an abnormally dangerous activity as a matter of law.

Preemption

Fermenta argues that the court should grant summary judgment in its favor because FIFRA preempts the plaintiffs’ common-law nuisance claim as a matter of law. This argument, as explained below, is without merit.
Preemption of State law, by Federal law, has been addressed numerous times by both Federal and New York State courts. In that regard, it is clear that preemption is not favored by the courts. This is particularly true where, as here, the law said to be preempted is within the State’s traditional police powers (Rogers v Consolidated Rail Corp., 948 F2d 858 [2d Cir 1991]; see also, Motor Vehicle Mfrs. Assn. v Abrams, 899 F2d 1315, 1319 [2d Cir 1990], cert denied 499 US 912; Tap Elec. Contr. Serv. v Hartnett, 76 NY2d 164 [1990]; Planned Consumer Mktg. v Coats & Clark, 127 AD2d 355 [1st Dept 1987], affd 71 NY2d 442 [1988]). "There are several ways in which preemption may occur * * * Congress can preempt state law expressly, 'by so stating in explicit terms on the face of a statute’ * * * Furthermore, in the absence of an express statement, Congress may still preempt state law when it 'intends that federal law occupy a given field’ * * * And even if Congress does not expressly preempt or intend to occupy the field, state law is nevertheless preempted if it 'actually con *199 fliets with federal law, that is, when compliance with both state and federal law is impossible, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of congress[.]” ’ ” (Motor Vehicle Mfrs. Assn. v Abrams, 899 F2d, supra, at 1318 [citations omitted].)
FIFRA provides that a State "shall not impose or continue in effect any requirements for labeling * * * in addition to or different from those required under this Act” (7 USC § 136v [b]). As stated in Little v Dow Chem. Co. (148 Misc 2d 11 [Sup Ct, Erie County 1990]), while State regulation of pesticide labeling is expressly preempted, the statute is silent as to State common-law negligence actions. Accordingly, such actions are not expressly preempted by FIFRA.
The court in Little v Dow Chem. Co. (supra) also found that FIFRA’s regulatory scheme does not preempt State tort law by implication. However, that court, relying on International Paper Co. v Ouellette (479 US 481), found that plaintiff’s causes of action for improper labeling and failure to warn conflict with FIFRA, and are therefore preempted.
Every case cited by Fermenta concerns a failure to warn scenario. Fermenta has not cited a single authority to support their proposition that FIFRA preempts State common-law public nuisance actions. Plaintiffs have not charged that Fermenta has an inadequate label. Rather, conceding that the label is adequate, the plaintiffs simply maintain that, regardless of fault, the existence of TCPA in the groundwater and in numerous private and public wells on Long Island constitutes a public nuisance. The court finds that FIFRA does not preempt this action. As quoted in Little v Dow Chem. Co., "The Senate Report states that '[generally, the intent of this provision is to leave to the States the authority to impose stricter regulation on pesticides use than that required under the Act.’ ” (Supra, at 13.)
In that regard, the court notes that the statute specifically provides that a "State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent that the regulation does not permit any sale or use prohibited by [EPA].” (7 USC § 136v [a]; and see, Burke v Dow Chem. Co., 797 F Supp 1128, 1141-1142 [ED NY 1992] ["It is not conceivable that any New York State court would now find FIFRA to have completely preempted all state tort law”].)

*200
Assumption of the Risk

Fermenta argues that plaintiffs assumed the risks inherent in the use of DCPA. While a person will be held liable for the creation of a public nuisance irrespective of fault, the law does indicate assumption of the risk is a defense in an action for nuisance. " Tn an action for nuisance the plaintiff’s assumption of the risk is a defense to the same extent as in other tort actions,’ Restatement (Second) of Torts § 840C, and the defense applies to public nuisance actions as well a those for private nuisance. Id., Comment (d).” (United States v Hooker Chems. & Plastics Corp., 722 F Supp 960, 970-971, supra.)
However, to the extent that the plaintiffs did, in fact, assume the risk, such assumption would not bar recovery, but merely diminish the amount of damages otherwise recoverable. (United States v Hooker Chems. & Plastics Corp., supra.) The court finds that questions of fact exist as to whether the plaintiffs assumed the risk. However, the existence of these factual questions does not preclude a finding that Fermenta is liable for the public nuisance (supra). Nor would a finding that plaintiff assumed the risk preclude the granting of permanent injunction. The question of whether plaintiffs assumed the risk, and how such assumption would affect the amount of damages to be awarded shall be addressed at a later date should there be a determination that as a matter of fact Fermenta is liable for the creation of a public nuisance.

Mitigation of Damages

As with the question of whether plaintiffs assumed the risk, the question of whether plaintiffs failed to mitigate damages will not preclude this court from awarding plaintiffs a permanent injunction should there be a finding upon the disputed facts that Fermenta is liable for the creation of a public nuisance. Again, the question of whether plaintiffs failed to mitigate damages is a factual question that will only affect the amount of damages potentially available to plaintiffs.

Preliminary Injunction

The court finds there to be factual questions precluding summary judgment for either plaintiffs or defendants. The court therefore turns to that part of plaintiffs’ motion seeking a preliminary injunction. "The law is well settled that in order to prevail on a motion for a preliminary injunction, the movant must clearly demonstrate (1) a likelihood of ultimate *201 success on the merits, (2) irreparable injury absent granting of the preliminary injunction, and (3) a balancing of the equities in his favor * * * Preliminary injunctive relief is a drastic remedy which will not be granted 'unless a clear right thereto is established * * * and the burden of showing an undisputed right rests upon the movant’ ” (Doe v Poe, 189 AD2d 132, 136 [2d Dept 1993] [citations omitted]).
"[T]he court is loathe to grant such an injunction, whereby the [plaintiff] would receive his ultimate relief sought, pendente lite” (Morgan v New York Racing Assn., 72 AD2d 740, 741 [2d Dept 1979]). "A preliminary injunction is a provisional remedy. Its function is not to determine the ultimate rights of the parties, but to maintain the status quo until there can be a full hearing on the merits” (Residential Bd. of Mgrs. v Alden, 178 AD2d 121, 122 [1st Dept 1991]; see also, Fischer v Deitsch, 168 AD2d 599 [2d Dept 1990]). Plaintiffs seek by way of a preliminary injunction the same relief they ultimately seek.
In any event, where, as here, there are substantial unresolved questions of fact, the court is unable to determine whether plaintiffs are likely to succeed on the merits (see, Goldberger v Tantleff, 171 AD2d 642 [2d Dept 1991]). The court notes that Fermenta has voluntarily changed its label to preclude the application of DCPA on Long Island. While this does not ameliorate the contamination already caused by DCPA, it will prevent further contamination.
And while it is unfortunate that various Long Island residents are unable to use their wells for drinking water, any damage incurred by such residents in hooking up to public water and purchasing bottled water is fully compensable monetarily. Moreover, it is sheer speculation that the ability to respond to fires is threatened by a potential loss of water pressure.
Since plaintiffs have failed to demonstrate either likelihood of success on the merits, or irreparable injury, their motion for a preliminary injunction is denied. However, the presence of TCPA in the groundwater at levels exceeding DEC standards is of concern to this court since the potential harm to residents has not been determined. Accordingly, this case shall hereafter proceed expeditiously to final resolution. Counsel for all parties are directed to appear in LAS Part 32 on January 20, 1994 at 9:30 a.m. so that the future course of this litigation can be determined.
*202 CONCLUSION
For the reasons set forth above, plaintiffs’ motion for summary judgment in this action for a declaratory judgment and permanent injunction is denied. That part of plaintiffs’ motion seeking a preliminary injunction is likewise denied. Defendants’ motion is granted to the extent that leave to amend their answer is granted and denied in all other respects.